1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
                                        AT SEATTLE
9

10   TRIDENT SEAFOODS                        CASE NO. C12-2265JLR
     CORPORATION,
11                                           ORDER GRANTING MOTION
                        Plaintiff,           FOR PARTIAL SUMMARY
12                                           JUDGMENT
            v.
13
     ACE AMERICAN INSURANCE
14   COMPANY,

15                      Defendant.

16                          **I.    INTRODUCTION**

17          Before the court is Defendant ACE American Insurance Company's ("ACE")

18   motion for partial summary judgment on Plaintiff Trident Seafoods Corporation's

19   ("Trident") breach of contract claim.  (*See* Mot. (Dkt. # 24).)  The court has reviewed the

20   motion, all submissions filed in support of or in opposition thereto, the balance of the

21   record, and the applicable law.  Having heard oral argument and being fully advised, the

22   court GRANTS ACE's motion for partial summary judgment.

## II.    BACKGROUND

Trident engages in wide-ranging activities in the seafood business and produces nearly 500 different seafood products.  (Misenti Decl. (Dkt. # 30) ¶ 3.)  It has 6,000 employees during its peak season, 16 processing plants throughout Alaska, the Pacific Northwest, and Minnesota (5/9/2013 Fonda Decl. Ex. D (Dkt. # 25-4) at 4), and has on-shore warehouses and offices (Resp. (Dkt. # 29) at 6).  It maintains a diverse insurance portfolio meant to ensure that it is protected in all of its activities and there are no gaps in coverage.  (Misenti Decl. ¶ 3.)  Trident's Commercial General Liability ("CGL") policy with ACE, from which this matter arises, includes coverage for "products/completed operations" liability.  (5/9/2013 Fonda Decl. Ex. G (Dkt. # 25-7) at 56, 80.)  The CGL policy excludes coverage for liability "arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured."  (*Id.* at 66.)  The products liability provision also contains an exception that states that the coverage does not include damage arising out of "the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the 'loading or unloading' of it."  (*Id.* at 81.)

Trident alleges that ACE breached the parties' insurance contract when it refused to indemnify Trident for damage caused by one of Trident's products.  (12/28/2012 Fonda Decl. Ex. A (Dkt. # 3) ¶¶ 22-26.)  Trident faced products liability for fish oil contaminated with petroleum, which it sold to a Japanese company, Matsuura.  (Misenti Decl. ¶ 5.)  Petroleum had contaminated fish oil stored in a tank on Trident's ship, the *Kodiak Alaska*, through a crack in a fuel tank.  (*Id.*)  Petroleum contaminated fish oil in

1   other tanks aboard the *Kodiak Alaska* when fish oil from the contaminated tank flowed

2   through other storage tanks during the unloading process in Dutch Harbor, Alaska.  (*Id.*)

3   Trident discovered and repaired the cracked fuel tank after it had delivered the

4   contaminated fish oil to Japan, but before Matsuura purchased the fish oil.  (*Id.* ¶ 6.)

5   Trident's onshore personnel failed to "connect the dots" and warn others about the

6   possibility of contaminated fish oil, and the fish oil was sold to Matsuura.  (*Id.*)  Trident

7   settled with Matsuura for over $5 million, $3 million of which was covered by Trident's

8   other insurers.  (*Id.* ¶ 8.)  Trident's products recall insurer contributed $2 million and its

9   protection and indemnity insurer contributed $1 million toward Trident's settlement with

10   Matsuura.  (*Id.* ¶ 7.)

11        Trident alleges that its products liability policy with ACE obligates ACE to pay

12   for some of the settlement with Matsuura.  (12/28/2012 Fonda Decl. Ex. A ¶¶ 14-17.)

13   Trident brings claims against ACE for breach of contract (*id.* ¶¶ 22-26), breach of its duty

14   of good faith (*id.* ¶¶ 27-30), violation of Washington's Consumer Protection Act, RCW

15   § 19.86, and Washington Administrative Code § 284-30-330 (*id.* ¶¶ 31-36), violation of

16   Washington's Insurance Fair Conduct Act, RCW § 48.30 (*id.* ¶¶ 37-42), contribution for

17   amounts paid by Trident's other insurers (*id.* ¶¶ 43-47), and declaratory judgment (*id.*

18   ¶¶ 48-49).  ACE asserts that it has no duty to indemnify Trident and moves for partial

19   summary judgment on Trident's breach of contract claim.  (Mot. at 1-2.)

20   *//*

21   *//*

22   *//*

ORDER- 3

# III.    ANALYSIS

## A.    Standard of Review

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that there is no material factual dispute.  *Id.* at 323-25.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  *Id.* at 324.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.    ACE is Entitled to Summary Judgment

The court must determine if ACE will prevail as a matter of law.  The interpretation of an insurance contract is a matter of law.  *Am. Best Food, Inc. v. Alea London, Ltd.*, 229 P.3d 693, 695 (Wash. 2010).  "An interpretation of an insurance clause must be reasonable and take into account the purpose of the insurance at issue."  *Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 871 P.2d 146, 152 (Wash. 1994).  However, a court must enforce the unambiguous language of a policy as written, and may not modify it.  *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (2005).  While

1   exclusions must be strictly construed against the insurer, "a strict application should not

2   trump the plain, clear language of an exclusion such that a strained or forced construction

3   results." *Id.*

4        In this case, ACE convincingly demonstrates the watercraft exclusion in the

5   insurance policy precludes coverage of Trident's claim as a matter of law.  Under

6   Washington law, "the phrase 'arising out of' is unambiguous and has a broader meaning

7   than 'caused by' or 'resulted from.'  It is ordinarily understood to mean 'originating

8   from', 'having its origin in', 'growing out of', or 'flowing from'." *Toll Bridge Auth. v.*

9   *Aetna Ins. Co.*, 773 P.2d 906, 908 (Wash. Ct. App. 1989) (citations omitted).  *See also*

10  *Mut. of Enumclaw Ins. Co. v. Jerome*, 856 P.2d 1095, 1097 (Wash. 1993) ("In

11  Washington, an accident arises out of the use of a vehicle if the vehicle itself or

12  permanent attachments to the vehicle causally contributed in some way to produce the

13  injury.") (internal quotation marks omitted).  Furthermore, "'arising out of' and

14  'proximate cause' describe two different concepts. *Toll Bridge*, 773 P.2d at 909-10.  It is

15  not necessary to examine the proximate cause of an incident in order to determine

16  whether the incident is excluded from coverage by "arising out of" language.  *Id.* at 910;

17  *see also Krempl v. Unigard Sec. Ins. Co.*, 850 P.2d 533, 535 (Wash. Ct. App. 1993)

18  ("[U]nder Washington law it is not necessary to analyze causation issues where the

19  policy language does not expressly require it.").

20        In *Toll Bridge*, the Washington State Toll Bridge Authority ("TBA"), which

21  operated ferries and ferry terminals, had a terminal liability policy, which excluded

22  incidents "arising out of the operations, maintenance or use of any watercraft."  773 P.2d

1    at 907-08.  The TBA sought indemnity from its insurer for an incident in which a car

2    struck a pedestrian as both were exiting a ferry.  *Id.* at 907.  The court upheld summary

3    judgment in favor of the insurer because the accident "originated from" unloading the

4    ferry, and thus, as a matter of law, the exclusion applied.  *Id.* at 908.

5           Like in *Toll Bridge*, summary judgment for the insurer ACE is appropriate in the

6    instant case.  Just like the insurance policy in *Toll Bridge,* the insurance policy between

7    Trident and ACE excludes coverage "arising out of" the ownership, use, or maintenance

8    of any watercraft.  (5/9/2013 Fonda Decl. Ex. G at 66.)  Just like the incident in question

9    in *Toll Bridge*, here the incident for which Trident seeks coverage originated from the use

10   or maintenance of a watercraft.  It is an uncontested fact that the contamination of the fish

11   oil originated from a cracked fuel tank aboard the *Kodiak Alaska*.  (Misenti Decl. ¶ 5;

12   Mot. at 3; Resp. at 9.)  This clearly indicates that the contamination originated from the

13   maintenance and use of the *Kodiak Alaska*.  Thus, like in *Toll Bridge*, the watercraft

14   exclusion applies as a matter of law and summary judgment for ACE is appropriate.

15          Trident attempts to distinguish *Toll Bridge* from the case at hand.  First, Trident

16   argues that *Toll Bridge* is factually inapposite because *Toll Bridge* involved a collision

17   accident rather than a products liability claim.  (Resp. at 21.)  This is a distinction without

18   a difference.  There is no reason to think that *Toll Bridge*'s interpretation of "arising out

19   of" insurance exclusions is confined to collisions.  *See Krempl*, 850 P.2d at 535 (citing

20   *Toll Bridge* in a non-collision context).  Trident's effort to distinguish *Toll Bridge* here

21   fails.  In a related argument, Trident asserts that watercraft exclusions in general only

22   apply to "collisions and other similar types of accidents and occurrences, not product

ORDER- 6

1    liability claims." (Resp. at 20.)  This assertion, however, contravenes the plain language

2    of the contract, which applies the watercraft exclusion to products/completed operation

3    hazard coverage.[1]

4         Second, Trident attempts to distinguish *Toll Bridge* by arguing that, unlike the

5    policy in *Toll Bridge*, Trident's products liability policy expressly covers the damage

6    because the policy specifically includes damage arising out of the "loading or unloading"

7    of vehicles, including watercraft.[2]  (Resp. at 21, 23; *see* 5/9/2013 Fonda Decl. Ex. G at

8    81.)  This argument fails because the contamination originated from a cracked fuel tank

9    aboard the *Kodiak Alaska* leaking into a tank of fish oil regardless of the subsequent

10   spread of the contamination during the unloading process.  (Misenti Decl. ¶ 5; Mot. at 3;

11   Resp. at 9.)  Washington precedent establishes that where an excepted risk sets into

12   motion a chain of events that includes a covered risk, the *Toll Bridge* analysis still

13   applies.  *See Krempl*, 850 P.2d at 706-7 (applying *Toll Bridge* in upholding summary

14   _____

15        [1] Trident's Products/Completed Operations Hazard coverage is part of its CGL coverage.
     (Fond Decl. Ex. G at 5.)  The watercraft exclusion in the policy is listed under exclusions to

16   Coverage A, which covers liability from bodily injury and property damage under the CGL
     coverage.  (*Id.* at 64, 66.)  Thus, the watercraft exclusion applies to Trident's claims for coverage

17   of its liability due to Matsuura's property damage.

18        [2] Trident also makes the similar argument that the inclusion of loading/unloading-based
     coverage in the policy trumps the watercraft exclusion.  (Resp. at 21.)  This argument fails for

19   similar reasons.  "Arising out of" means "originating from."  *Toll Bridge*, 773 P.2d at 908.  The
     contamination originated from the cracked fuel tank even if it was later spread in the unloading

20   process.  Thus, the watercraft exclusion prevents coverage in this situation.  *See also Krempl*,
     850 P.2d at 706-7 (applying *Toll Bridge* in upholding summary judgment for an insurer in a case

21   where "the *excepted* risk, use or maintenance of an automobile, set into motion what Krempl
     contends is a *covered* risk, throwing the flaming tank of gasoline") (emphasis in original).  While

22   exclusions from coverage must be strictly construed against an insurer, "a strict application
     should not trump the plain, clear language of an exclusion such that a strained or forced
     construction results."  *Quadrant Corp.*, 110 P.3d at 737.

ORDER- 7

1   judgment for an insurer in a case where "the *excepted* risk, use or maintenance of an

2   automobile, set into motion what Krempl contends is a *covered* risk, throwing the

3   flaming tank of gasoline") (emphasis in original).  Thus, Trident's contention that this

4   distinguishes its case from *Toll Bridge* fails.

5         Third, Trident attempts to distinguish its case from *Toll Bridge* by noting that in

6   *Toll Bridge* the insured had multiple insurance policies and that the watercraft exclusion

7   functioned to avoid overlapping coverage.  (Resp. at 21.)  However, this appears to be

8   true for Trident as well.  Trident's products recall and protection and indemnity insurers

9   together paid $3 million toward Trident's settlement with Matsuura.  (Misenti Decl. ¶ 7.)

10  Although Trident alleges that ACE is responsible for some or all of the amount paid by

11  Trident's other insurers (12/28/2012 Fonda Decl. Ex. A ¶¶ 43-47), the presence of

12  multiple other insurance policies which at least colorably cover this incident defeats

13  Trident's efforts to distinguish *Toll Bridge* on these grounds.  It is also not clear that the

14  presence of other insurance policies matters to the court's reasoning in *Toll Bridge*.  The

15  court in *Toll Bridge* relies on the plain language of the insurance policy, not the policy's

16  broader context.  773 P.2d at 910 ("The terms of an insurance policy must be construed in

17  light of the plain, ordinary and popular meaning of the words used.").  Thus, Trident's

18  attempts to distinguish *Toll Bridge* from the instant case fail.

19        Trident also argues that applying the policy's watercraft exclusion here would

20  make Trident's products liability policy with ACE illusory.  (Resp. at 18-19.)  Trident,

21  however, has many shore-based facilities, including processing plants, warehouses, and

22  offices.  (Resp. at 6.)  It has 16 processing plants throughout Alaska, the Pacific

1   Northwest and Minnesota.  (5/9/2013 Fonda Decl. Ex. D at 4.)  ACE admits in its

2   briefing that a product liability claim where the loss originated from one of these shore-

3   side facilities would be covered.  (Reply (Dkt. # 36) at 7.)  *See also Toll Bridge*, 773 P.2d

4   at 910 (holding that the insurance policy with a watercraft exclusion is not illusory

5   because "there are numerous terminal facility operations creating potential liability

6   unrelated to any activity or actions of the vessel").

7   **C.      *American Best Food* is Not Applicable**

8          Trident further argues that shore-based negligence on the part of its employees

9   was an intervening cause of the damage to Matsuura, and that this intervening cause

10  trumps the damage's origins aboard the *Kodiak Alaska*.  (Resp. at 22.)  To support this

11  contention, Trident cites *American Best Food, Inc. v. Alea London, Ltd.*, in which the

12  court upheld the reversal of summary judgment for an insurer in a case where an insured

13  nightclub allegedly negligently "dumped" an injured patron out on the sidewalk

14  following an assault.  229 P.3d 693, 695 (Wash. 2010).  The court held that the insurer

15  had a duty to defend the nightclub as a matter of law.  *Id.* at 701.  It held that the

16  insurance policy covered the nightclub's liability "to the extent [post-assault negligence]

17  caused or enhanced" the patrons injuries, despite the policy excluding liability "arising

18  out of" assault or battery.  *Id.* at 697-99.  However, the *American Best Food* Court never

19  determined to what extent the nightclub's post-assault negligence made it liable for the

20  patron's injuries, if at all.  *American Best Food* deals with the duty to defend rather than

21  the duty to indemnify.  *Id.* at 695.  As the court makes clear multiple times, "the duty to

22

1    defend is different from and broader than the duty to indemnify."[3]  *Id.* at 696, 699, 700.

2    *See also Trident Seafoods Corp. v. Commonwealth Ins. Co.*, C10-0214RAJ, 2010 WL

3    3894111, at *9 n.3 (W.D. Wash. Sept. 29, 2010) (rejecting *American Best Food*'s

4    applicability because its "holdings relate to the insured's duty to defend, which is not an

5    issue in Defendant's motion. . . .  To whatever degree [*American Best Food*] also touches

6    on the duty to indemnify . . . [it] does not represent a change in the law").  Furthermore,

7    *American Best Food* is factually distinguishable from the instant case:  in *American Best*

8    *Food*, coverage depended on the nightclub's negligence directly causing or enhancing the

9    victim's injuries.  229 P.3d at 699 (holding that the policy afforded coverage "to the

10   extent [post-assault negligence] caused or enhanced [plaintiff]'s injuries").  Trident's

11   shore-based negligence consists of failing to "connect the dots" after discovering the

12   cracked fuel tank when the contaminated fish oil had already been shipped to Japan.

13   (Misenti Decl. ¶ 6.)  This is less direct as a cause of Trident's products liability than the

14   nightclub's post-assault negligence was in *American Best Food*, even though shore-based

15   negligence may be a but-for cause of Trident's liability.

16   **D.    Industry Custom and Other Insurance Policies Are Not Relevant Because of
          the ACE Policy's Unambiguous Language**

17           Trident argues the watercraft exclusion does not apply to their

18   Products/Completed Operations Hazard coverage because applying a watercraft

---

[3] The court elaborates that "the duty to indemnify exists only if the policy *actually covers* the insured's liability.  The duty to defend is triggered if the insurance policy *conceivably covers* allegations in the complaint."  *Am. Best Food*, 229 P.3d at 696 (emphasis in original).

1  exclusion to a products liability claim "contravenes industry understanding, custom, and

2  practice."[4]  (Resp. at 14-15.)  In support of this, Trident cites an Insurance Risk

3  Management Institute statement that automobile exclusions only apply to damage arising

4  "out of the automobile's inherent nature" and actually produced by the automobile.  (*Id.*

5  at 14.)  Trident further cites multiple declarations from insurance industry professionals

6  that it is unusual for a watercraft exclusion to apply to a products liability policy.  (Resp.

7  at 19.)  ACE disputes this description of industry custom and points to the existence of a

8  products/completed operations hazard coverage policy that does not have a watercraft

9  exclusion.  ACE argues that the existence of such a policy indicates the Trident had a

10  choice regarding coverage and chose to purchase a policy with a specific watercraft

11  exclusion.  (Reply at 2.)  The court, however, need not reach industry custom to decide

12  this case.[5]  The plain language of the policy indicates that the watercraft exclusion

13  applies to the products completed operations coverage.  *See supra* note 1.  The "arising

14  out of" watercraft exclusion is unambiguous as a matter of law.  *Toll Bridge*, 773 P.2d at

15  908.  A court must enforce the unambiguous language of a policy as written, and may not

16  modify it.  *Quadrant*, 110 P.3d at 737.

17  _____

18  [4] Trident also argues that watercraft exclusions only apply to "collisions and other similar
     types of accidents."  (Resp. at 20.)  The court rejects this argument as well because it contravenes

19  the plain language of the contract.

20  [5] The court consequently does not reach ACE's request to strike the declarations
     submitted by Trident in support of its response, many of which have to do with industry custom.

21  (*See* Reply at 10-12.)  The court has not used the declarations in coming to its decision with the
     exception of the Misenti Declaration.  The court has only used the Misenti Declaration to support

22  specific facts of which Mr. Misenti has personal knowledge.

1    At oral argument, Trident referred to an insurance policy with Liberty Mutual,

2  which includes products completed operations hazard coverage, and which, counsel

3  represented, expanded its watercraft exclusion to explicitly cover instances of negligent

4  hiring, training and supervision.   Trident argues that a comparison of the Liberty Mutual

5  policy and the ACE policy indicates that the ACE policy does not cover exclude

6  instances of negligent hiring, supervision, and training.  Indeed, "in evaluating the

7  insurer's claim as to meaning of language used, courts necessarily consider whether

8  alternative or more precise language, if used, would have put the matter beyond

9  reasonable question." *Lynott*, 871 P.2d at 151.  However, this argument misses the mark.

10  Even if, *arguendo*, the ACE policy covers negligent hiring, supervision, and training, it

11  explicitly excludes coverage for incidents arising out of the "use" or "maintenance" of a

12  watercraft.  (5/9/2013 Fonda Decl. Ex. G at 66.)  Trident's liability, which was caused by

13  a cracked fuel tank aboard the *Kodiak Alaska* (Misenti Decl. ¶ 5), plainly arose out of the

14  "use" and "maintenance" of a watercraft.  Even if the ACE policy does not exclude

15  watercraft-based negligent hiring, training, or supervision, it would still exclude the

16  incident in question in this matter.  Negligent hiring, training, and supervision may be a

17  but-for cause of the fish oil contamination, but it is plain that, in this matter, the

18  contamination originated from the cracked fuel tank, and is thus excluded by ACE's

19  watercraft exclusion.

20  //

21  //

22  //

1

**IV.   CONCLUSION**

2        For the forgoing reasons, the court GRANTS ACE's motion for partial summary

3   judgment (Dkt. # 24).

4        Dated this 2nd day of August, 2013.

5

6        _____

7        JAMES L. ROBART
        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 13